*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

DAMIEN BANKS,

   Defendant-Appellant.

UNPUBLISHED
June 13, 2025
2:22 PM

No. 370660
Macomb Circuit Court
LC No. 2013-000805-FC

Before: MALDONADO, P.J., and M. J. KELLY and RIORDAN, JJ.

PER CURIAM.

Defendant, Damien Banks, appeals by right his March 18, 2024 Amended Judgment of Sentence. In 2013, defendant was convicted by jury of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84, conspiracy to commit AWIGBH, MCL 750.157a and MCL 750.84, armed robbery, MCL 750.529, and conspiracy to commit armed robbery, MCL 750.157a and MCL 750.84. In 2013, the trial court sentenced defendant as a fourth habitual offender, MCL 769.12, to 6 to 20 years' imprisonment for the two assault related charges, and 15 to 40 years' for the two armed robbery related charges. In 2024, after the trial court vacated defendant's conviction of conspiracy to commit AWIGBH, the court updated defendant's minimum sentencing guidelines and reimposed the same sentence for defendant's remaining convictions.

Defendant now argues that he is entitled to another resentencing because the trial court improperly scored Offense Variable (OV) 3, MCL 777.33, and OV 10, MCL 777.40, the correction of which would reduce his minimum sentencing guidelines range. We affirm.

## I. BACKGROUND

Defendant's convictions arise from an assault and robbery that he committed with codefendant, David Lyons, on June 14, 2012. The basic facts of the case were outlined in a previous decision of this Court:

> Brad Bohen lived down the street from Tiffany Greathouse. After meeting in the neighborhood, Bohen became friends with Greathouse's brother, Maliki

-1-

Greathouse, and her boyfriend, defendant [].  On the day in question, Bohen testified that [defendant] and Maliki were visiting his home when he took a phone call from his attorney.  Bohen told his attorney that he had gathered sufficient money to pay a $650 retainer plus additional fees and that he wished to procure his services. When [defendant] and Maliki heard this conversation, they allegedly looked at each other and left.

Later that day, Bohen left his home with approximately $2,500 in cash in his pocket.  He travelled with his friend Renee Nomer and her two children to Costco and then to T.G.I. Friday's for dinner.  While inside the restaurant, Bohen fielded two phone calls from [defendant].  Bohen alleged that [defendant] wanted him to purchase some Xanax and Adderall from him.  Bohen told [defendant] that he could meet him at the restaurant.  [Defendant] called once and claimed to be outside the restaurant.  Bohen could not find him in the parking lot and returned to his table.  Bohen testified that [defendant] called again and claimed to be waiting outside.  When Bohen exited the restaurant, he saw Greathouse sitting inside a vehicle in the parking lot.  Bohen asserted that Greathouse pointed toward the back of the restaurant.

Bohen walked toward the back parking lot and saw [defendant] and Lyons standing near the dumpster.  Lyons is the boyfriend of Greathouse's mother and Bohen had not met him before the attack.  As Bohen approached the men, someone struck him from behind in the head and he fell to the ground.  [Defendant] and Lyons ran toward him, and Bohen initially believed they were coming to assist him.  However, [defendant] and Lyons joined the fray, keeping him on the ground, and hitting and kicking him.  A young female employee of the restaurant came out at the end of her shift and saw two tall, thin black men wearing hooded jackets beating a white man who was curled on the ground in fetal position.  One man was using a "small, blunt object" that "looked like a hammer" to beat the victim in the head.  She saw a third man standing watch.  She yelled and the men ran away, with one man dropping something out of his pocket along the way.  At the end of this encounter, Bohen had only $661 remaining in his pockets.

Bohen was hospitalized for five days and required surgery to remove a shard of his skull from his brain.  Investigating officers brought photographic lineups to the hospital for Bohen's review.  The first included black and white photographs and Bohen was unable to identify his attackers.  In the second lineup, Bohen identified [defendant].  In a third, Bohen selected Lyons from the array.

Following a joint trial before a single jury and several days of jury deliberations, the jury . . . convicted [defendant and Lyons] of assault with intent to commit great bodily harm, armed robbery, and conspiracy to commit those

offenses. [*People v Lyons*,[1] unpublished per curiam opinion of the Court of Appeals, issued October 22, 2015 (Docket Nos. 319252 and 319889), p 15.]

The trial court sentenced defendant as previously noted.

After defendant appealed his convictions and sentences by right in 2014, this Court affirmed defendant's convictions, but vacated defendant's sentences, holding that defendant was entitled to remand for the trial court to determine whether it would have imposed a materially different sentence in light of *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015). *Lyons*, unpub op at 15. On remand, the trial court denied defendant resentencing, holding that it would have given defendant the same sentence despite the guidelines having been made advisory by *Lockridge*. *People v Banks*, unpublished opinion per curiam of the Court of Appeals, issued March 22, 2018 (Docket No. 336639), p 3. Defendant appealed by right a second time, arguing that he was entitled to a remand for resentencing because his minimum sentencing guidelines range was scored incorrectly. *Id*. This Court affirmed the trial court's sentence without addressing the merits of defendant's argument, determining that it was outside the scope of this Court's remand order. *Id*.

Then, in 2023, after Lyons's conviction for conspiracy to commit AWIGBH was vacated, defendant moved in the trial court for relief from judgment pursuant to MCR 6.500, arguing that the trial court should similarly vacate his conviction for conspiracy to commit AWIGBH. The trial court vacated defendant's conviction for conspiracy to commit AWIGBH and agreed that defendant was entitled to be resentenced with corrected guidelines. Defendant's resentencing hearing was held on February 27, 2024 and March 12, 2024. The trial court considered the updated guidelines and once again imposed the same sentence it had originally ordered in 2013.

This appeal followed.

## II. DISCUSSION

### A. PRESERVATION AND STANDARDS OF REVIEW

Defendant preserved his arguments by objecting to his scores for OV 3 and OV 10 score in the trial court on the same grounds that he now asserts on appeal. See *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018). This Court reviews for clear error a trial court's findings in support of a particular score under the sentencing guidelines. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). The prosecution bears the burden to establish the facts in support of a score by a preponderance of the evidence. *People v Osantowski*, 481 Mich 103, 111; 748 NW2d 799 (2008). Whether the facts are adequate to satisfy the scoring conditions prescribed by statute is a question of statutory interpretation, which this Court reviews de novo. *Hardy*, 494 Mich at 438.

---

[1] Defendant's case was consolidated with Lyons's.

B. OV 3

Defendant first argues that the trial court should have only assessed 10 points instead of 25 points for OV 3 because, although the victim suffered injuries that required medical treatment there was no evidence that those injuries were life-threatening or permanently incapacitating. We disagree.

OV 3 is scored for "physical injury to a victim." MCL 777.33(1). If "[b]odily injury requiring medical treatment occurred to a victim," the trial court should assess 10 points. MCL 777.33(1)(d). But if "[l]ife threatening or permanent incapacitating injury occurred to a victim," the trial court should assess 25 points. MCL 777.33(1)(c). "In scoring OV 3, the focus is not on the defendant's actions; rather, OV 3 assesses whether a victim's injuries were life-threatening." *People v Chaney*, 327 Mich App 586, 588; 935 NW2d 66 (2019) (quotation marks, citation, and emphasis omitted). Although the statute does not define "life threatening," this Court has determined that the ordinary dictionary definition of "life-threatening" means "capable of causing death: potentially fatal." *Id*. at 589 (quotation marks and citation omitted). Accordingly, there must be "some evidence indicating that the injuries were, in normal course, potentially fatal." *Id*. at 591 (footnote omitted). This Court also has observed that "there are many conditions that if not treated can become life-threatening," so courts "must take into account the effect of medical treatment." *Id*. at 591 n 4. However, medical testimony is not required to establish that an injury is life-threatening. *People v McCuller*, 479 Mich 672, 697 n 19; 739 NW2d 563 (2007).

"When calculating sentencing guidelines, the trial court may consider all record evidence, including the presentence investigation report (PSIR), plea admissions, and testimony. The trial court may also consider victim-impact statements, and may make reasonable inferences from evidence in the record." *People v Montague*, 338 Mich App 29, 55; 979 NW2d 406 (2021) (citation omitted).

In this case, the trial court assessed 25 points for OV 3, concluding that:

Twenty-five points is appropriately scored. The victim suffered a skull fracture requiring a craniotomy after being beat with a hammer. I realize and acknowledge that it's not an element of a charged defense but I'm satisfied that beating with a hammer, skull fracture, craniotomy and an inpatient hospitalization qualifies as life-threatening at the time it was incurred. So OV 3 is appropriately scored at 25 points.

That assessment was supported by a preponderance of the evidence. See *Hardy*, 494 Mich at 438, 835 NW2d 340. Bohen testified that he was repeatedly hit and kicked in the head by three attackers, at least one of whom used a hammer. Bohen spent five days in the hospital, during which time he underwent surgery to repair his broken skull. More specifically, "a piece of [his] skull was embedded in the top of [his] brain." Bohen's medical records were admitted into evidence and included "some x-rays . . . that showed a hole in Mr. Bohen's skull," and showed that Bohen sustained two lacerations to the scalp and that Bohen was placed in a drug-induced coma after having a seizure. Additionally, the PSIR indicated that Bohen was "placed into a

medically induced coma due to the severity of his head injuries including multiple skull fractures that were intruding into the brain. His status at admission to the hospital was life-threatening." These facts are sufficient to show, by a preponderance of the evidence, that the injury in this case was "potentially fatal." See *Chaney*, 327 Mich App at 591.

Accordingly, then, contrary to defendant's argument on appeal, this case is unlike *Chaney*. The three-year-old child-abuse victim in *Chaney* suffered severe burns to the lower legs and feet from hot bath water while in the defendant's care. *Id*. at 588. The victim was hospitalized for several weeks to treat the burns. *Id*. This Court held that the trial court clearly erred by finding that the victim suffered a "life-threatening" injury for purposes of MCL 777.33 and assessing 25 points. *Id*. at 590. This Court reasoned that although the victim suffered "serious injury requiring a lengthy hospitalization," the medical records did not indicate that the injuries were potentially fatal, nor was there testimony to that effect. *Id*. at 590-591. In contrast, here, as discussed, there was "some evidence indicating that the injuries were, in normal course, potentially fatal." *Id*. at 591. Therefore, the trial court did not clearly err by finding that Bohen's head injuries were life-threatening. See *Hardy*, 494 Mich at 438.

## C. OV 10

OV 10 addresses a defendant's exploitation of a vulnerable victim and is outlined in MCL 777.40. The term " '[e]xploit' means to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). A "vulnerable victim" is one who has "readily apparent susceptibility . . . to injury, physical restraint, persuasion or temptation." MCL 777.40(3)(c). This "susceptibility" need not be inherent in the victim; rather, "the statutory language allows for susceptibility arising from external circumstances as well." *People v Huston*, 489 Mich 451, 466; 802 NW2d 261 (2011). Likewise, "a defendant's 'predatory conduct,' . . . alone (eo ipso), can create or enhance a victim's 'vulnerability.' " *Huston*, 489 Mich at 468.

"Predatory conduct" refers to preoffense conduct directed at a victim for the primary purpose of victimization, MCL 777.40(3)(a). A trial court must assess 15 points under OV 10 when "[p]redatory conduct was involved." MCL 777.40(1)(a). To assess 15 points, a trial court must respond affirmatively to each of these inquiries:

> (1) Did the offender engage in conduct before the commission of the offense?
>
> (2) Was this conduct directed at one or more specific victims who suffered from a readily apparent susceptibility to injury, physical restraint, persuasion, or temptation?
>
> (3) Was victimization the offender's primary purpose for engaging in the preoffense conduct? [*People v Cannon*, 481 Mich 152, 162; 749 NW2d 257 (2008).]

Predatory conduct does not include "purely opportunistic criminal conduct or preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection." *Huston*, 489 Mich at 462 (quotation marks and citation omitted). Rather, predatory conduct encompasses "only those forms of preoffense conduct that are commonly

understood as being predatory in nature, e.g., lying in wait and stalking." *Id.* (quotation marks and citation omitted).

In the present case, the trial court assessed 15 points for OV 10, finding that:

[T]he victim was called repeatedly, set up a meeting, he was called and told to leave the public restaurant where he was with his two kids, a girlfriend and I think two kids, or a friend and two kids, to go out to a more secluded area in the parking lot at the back of the restaurant and he was struck from behind with a hammer.

The trial court also determined that *People v Huston* "is almost particularly on point." We agree. In *Huston*, two cohorts were lying in wait in a dark parking lot, armed with BB guns, and ultimately robbed and carjacked a single victim. *Id.* at 454-455, 463. The Michigan Supreme Court held that lying in wait to rob a victim who just happens to wander by in a parking lot constituted predatory conduct. *Id.* at 463-464. The Court noted that, while the defendant may not have been lying in wait for a specific victim, he nonetheless was lying in wait for a victim; thus, the conduct was directed at a victim. *Id.* at 463.

In this case, defendant, together with Lyons and a third cohort waited in the parking lot behind T.G.I. Friday's for Bohen to come out. Defendant called Bohen and instructed him to meet defendant outside. In compliance, Bohen exited the restaurant and circled around to the back parking lot. As soon as Bohen saw defendant, defendant's cohort struck defendant from behind with a hammer. At that point, defendant and Lyons rushed Bohen and joined in the attack. Thus, a preponderance of the evidence in this case supports that defendant—like the defendant in *Huston*—"laid in wait" while his cohort was armed and hidden from view and that defendant had "the primary purpose of eventually causing a person to suffer from an injurious action, i.e., an armed robbery." *Id.* at 463-464.

Defendant's attempts to distinguish *Huston* are not persuasive. First, it is not particularly helpful to defendant that he knew Bohen before the attack and targeted him specifically, rather than waiting in the parking lot for any potential victim to come along, as the defendant in *Huston* did. To the contrary, predatory conduct often is "directed at one or more *specific* victims" *Cannon*, 481 Mich at 162 (emphasis added). *Huston* simply clarified that predatory conduct also may include conduct directed at *nonspecific* victims, too. *Huston*, 489 Mich at 454. Second, it is of no import that Bohen expected to meet defendant in the parking lot and could "clearly see" defendant before the attack. Bohen did *not* expect to be struck from behind in the head with a hammer by a defendant's cohort and then beaten and robbed by defendant and two other men. Accordingly, when defendant instructed Bohen to go to the restaurant's back parking lot where defendant was waiting with his cohorts to outnumber, beat, and rob Bohen, defendant engaged in predatory conduct that created or enhanced Bohen's vulnerability, such that 15 points were appropriate for OV10. See *id.* Thus, we are not left with a definite and firm conviction that the trial court erred by assessing 15 points for OV 10. See *Hardy*, 494 Mich at 438.

## III. CONCLUSION

Defendant has not established that the trial court incorrectly assessed OV 3 or OV 10; therefore, defendant is not entitled to resentencing.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Michael J. Riordan